NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0635n.06

No. 14-5278

FILED
Sep 11, 2015
DEBORAH S. HUNT, Clerk

**UNITED STATES COURTS OF APPEALS FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| TYLER SCHAEFFER | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE: BATCHELDER, ROGERS, and KETHLEDGE, Circuit Judges.

ROGERS, Circuit Judge. Tyler Schaeffer, along with a varying number of co-conspirators, committed a string of robberies between July 26, 2010 and September 14, 2012. Two co-conspirators who were charged together with Schaeffer entered plea agreements acknowledging that Schaeffer had used a firearm in some of the robberies. Schaeffer admitted participating in the robberies but denied using a real firearm in any of them, and went to trial on the counts based on his use of firearms under 28 U.S.C. § 924(c). At trial, the district court permitted the government to introduce testimony from a witness who claimed that several years prior to the robberies Schaeffer showed him a firearm that looked similar to a gun used in one of the robberies. In his defense, Schaeffer sought to present statements in a letter written to Schaeffer by Rodney Ruffin, one of Schaeffer's co-conspirators who had entered a plea agreement and refused to testify in Schaeffer's trial. The letter stated that Schaeffer had not used

a real gun in another one of the robberies but that Ruffin would not so testify for fear of violating the terms of his plea agreement. The district court excluded this evidence as not being against Ruffin's interest and lacking corroboration. Schaeffer was convicted on all firearm counts, and he appeals, attacking the district court's evidentiary rulings. The testimony that Schaeffer had previously possessed a firearm was properly admitted as directly relevant to whether Schaeffer used a firearm during the robbery in question. As to Ruffin's letter, even if it should have been admitted as a statement against interest, the error was harmless.

In March 2013, a federal grand jury issued an indictment charging Tyler Schaeffer with 14 counts arising from a string of seven robberies committed between July 26, 2010 and September 14, 2012. The charges consisted of seven counts of Hobbs Act robbery, one count of Hobbs Act conspiracy, four counts of using a firearm in a crime of violence in violation of 18 U.S.C. § 924(c), one drug conspiracy count, and one count of possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c). The drug-related counts arose from the last robbery, which targeted drug dealers. Two alleged co-conspirators, Rodney Ruffin and Jerel Johnson, were also charged with participating in some of the robberies. Johnson pled guilty to two of the robbery counts, one of the firearm counts, and the drug conspiracy count as part of a plea agreement in exchange for other charges being dropped against him. Ruffin pled guilty to the robbery and gun counts arising from the September 14, 2012 robbery of the drug dealers as part of a plea agreement in exchange for other charges being dropped. Notwithstanding Johnson's and Ruffin's pleas, which suggested that firearms had been used in two of the robberies, Schaeffer pled guilty to all counts except for the firearm counts, and proceeded to trial for a jury determination of whether he had used firearms in committing the robberies. Upon discovering that one of the guns used in one of the robberies (in which only

Schaeffer had been charged) had not in fact been a real firearm, the government dismissed one of the firearm counts.[1] At trial, Schaeffer was found guilty on the remaining firearm counts.

Schaeffer's appeal challenges two evidentiary rulings by the district court. First, the district court permitted Anthony Lashley, an acquaintance of Schaeffer's, to testify that "a few years before" the last robbery on September 24, 2012, Schaeffer had brought a firearm to Lashley's residence and they shot at targets with it together. Further, Lashley testified that the firearm Schaeffer showed him looked similar to the gun Schaeffer could be seen holding in a surveillance photograph showing a robbery of a Subway on August 11, 2012. (The actual gun used in that robbery was never produced at trial.) Relying on *United States v. Price*, 329 F.3d 903 (6th Cir. 2003), the district court reasoned that because Lashley's testimony was directly probative of Schaeffer's use of a gun in the robbery it was not subject to Rule 404(b). Although the district court permitted Lashley to testify as to his specific experience with this firearm, the court barred testimony as to Schaeffer's "general proclivity to possess and/or sell firearms." The court also instructed the jury to consider evidence of Schaeffer's prior possession of a firearm only to the extent that it was relevant to opportunity.

Second, the district court barred Schaeffer's attempt to introduce a letter that Ruffin sent to Schaeffer stating that Schaeffer had not used a real gun during the robbery of the drug dealers on September 14, 2012. Schaeffer had first called Ruffin to testify, but Ruffin's attorney indicated that he had instructed Ruffin not to do so. The district court excused the jury and conducted a hearing to determine what testimony Ruffin would be able to provide. Schaeffer asked Ruffin to confirm that Schaeffer had not used a real gun on September 14, 2012. Ruffin

---

[1] The government acknowledged that "there is some indication that at least one of the robbers used a BB gun," but stated that it sought dismissal only for strategic reasons and did not concede that Schaeffer was innocent on that count.

refused to testify as to that issue, invoking the Fifth Amendment. (At that point Ruffin had already pled guilty to the charges arising from the September 14 robbery of the drug dealers, and had affirmed under oath the government's allegation that Schaeffer had used a real gun on September 14.) Schaeffer then sought to admit a letter that Ruffin had written to Schaeffer while both were in jail, either as a statement against interest under Fed. R. Evid. 804(b)(3) or under the residual hearsay exception, Rule 807. Seeking to show that the letter should not be admitted, the government presented recordings of calls Ruffin had made from jail that allegedly showed Ruffin discussing with his father a plan for Ruffin and Schaeffer to coordinate their version of events. Other clips allegedly demonstrated that Ruffin asked his father to ask Ruffin's friends to convince witnesses not to testify.

Ruffin signed his plea agreement on April 30, 2013 and pled guilty the next day. The phone calls suggesting cooperation between Ruffin and Schaeffer all predated the plea agreement. The most directly relevant recordings are set forth here. On April 5, 2013, Ruffin stated in a call:

> He come back from court, wrote me a note, and said it's going to be our word against his charge-partner's word, but that if I said that it was a BB gun that was used, that they'd drop all the brandishing charges on all his indictments, but in order to do that I'd have to take it to trial. So I don't know—if they offer me a good deal, I don't know whether I should plead out or whether I should take it to trial and try to save him from, you know, life. I don't know what to do.

On April 21, Ruffin had the following exchange with his father:

> Father: You need to distance yourself from [Tyler Schaeffer],[2] son. I hate to say it, but you don't need no contact with him. Ain't going to do you no good— everything that's been said has been said.
>
> Ruffin: What do you mean?
>
> Father: Anything more—you talking to him makes it look bad on you.

---

[2] Ruffin's father says "him," but Ruffin had previously been saying that a birthday card he had written for "Tyler" had been confiscated.

> Ruffin: So I'm just going to quit talking to a friend over something that—you know what I mean—I think—I don't forget people, dad, you know what I mean?

> Father: I know, but right now you need to.

> Ruffin: We're on this case together, man. Anything his lawyer says, he lets me know, you know what I mean?

> Father: OK.

> Ruffin: We have to work together because this other guy is telling, you know what I mean? So any deal that—

> Father: He's already said everything, there ain't no more to say.

> Ruffin: I haven't said nothing.

Ruffin's letter to Schaeffer is not itself a part of the record, but its contents were read into

the record during Ruffin's sentencing hearing:

> Look Tyler I know it was a fake gun. We didn't want to [fucking][3] hurt anyone. But with my record I didn't think I could beat the Feds in trial. I was told they could career me out and give me 20 years. So in my best interest I ple[]d[4] out so I could get acceptance of responsibility so I could get the lowest time possible. I just want to do this time so I can get home to my dad. I'm sorry I can't help more. I should be Osila on the next run. Write dad and keep him posted on your trial. I love you man but I love my family more and just want to get home. Write me back. I'm sorry man you know if I say it was a fake I won't get acceptance of responsibility. And I'll get more time. I'm not going to lie and say it was real because I'd be under oath so I'm pleading the Fifth and not saying anything. I'm sorry [we're] in this mess. Like I said I love ya. Sorry I can't help I feel like [word not read]. RUFFIN Keep your head to the sky.

The record does not indicate the date of this letter but Ruffin's apparent references to having

"pled out" and being sent to a detention facility in Ocilla, Georgia suggest that he wrote the letter

shortly after having pled guilty on May 1, 2013.

Finding that Ruffin's invocation of the privilege may have been proper, the district court

stated that Ruffin "may have been said to have been unavailable." However, the court ruled that

the statements in Ruffin's letter were not likely enough to expose Ruffin to liability to constitute

---

[3] The trial transcript uses "f'ing," outside of quotation marks, to indicate that the person reading the transcript paraphrased the word used.
[4] The trial transcript has "plead," but in context it is extremely likely that Ruffin intended to use the past tense.

statements against interest, and the statements were not supported by corroborating circumstances. Therefore, the court did not permit Schaeffer to present the letter as evidence.

The court did not err in admitting Lashley's testimony that Schaeffer had, several years earlier, owned a firearm that looked similar to the object used in the August 11, 2012 robbery. This evidence suggests that the object that Schaeffer used in the robbery was in fact a firearm, namely, the firearm Lashley testified that Schaeffer had previously possessed. This is not the strongest possible evidence, but it is relevant nonetheless and in no way involves improper inferences based on Schaeffer's character or propensities. Further, this evidence is more probative than prejudicial, because Lashley's testimony does not in itself cast Schaeffer in a bad light or invite the jury to make unfair inferences.

Admitting Lashley's testimony did not violate Rule 404(b) of the Federal Rules of Evidence because Lashley's testimony was not "other acts" evidence to which Rule 404(b) applies. Evidence of such "other acts" does not include evidence that is "inextricably intertwined with the evidence regarding the charged offense." *United States v. Weeks*, 716 F.2d 830, 832 (11th Cir. 1983); *see Price*, 329 F.3d at 906. Lashley's testimony was so intertwined with Schaeffer's use of a firearm in the robbery. In *Price*, an appeal arising from a felon-in-possession conviction, we upheld the admission of the defendant's certificate of completion in a firearms safety course. 329 F.3d at 905. We reasoned that the certificate was not "other acts" evidence subject to Rule 404(b) because the certificate was "itself . . . probative of the crime charged, without regard to whether any 'other act' occurred." *Id.* at 906. This was because, at the very least, "the certificate show[ed] that Price was taking steps to possess a firearm" at a time prior to when he allegedly possessed a firearm. *Id.* By the same logic, Lashley's testimony that the object Schaeffer had used in the August 11, 2012 robbery resembled a firearm Schaeffer had

previously possessed was directly probative of the crime charged—Schaeffer's use of a firearm in that robbery. The crucial question in Schaeffer's trial was essentially whether he was in possession of a firearm during the robberies. Lashley's testimony that the object used in the August 11, 2012 robbery resembled a firearm Schaeffer had possessed earlier was more directly probative than evidence about Schaeffer's preparation to obtain a firearm would have been.

Further, any prejudice caused by Lashley's testimony did not outweigh its probative value, so it was admissible under Fed. R. Evid. 403. To be sure, the several years that passed between Schaeffer's possession of the firearm and the robbery in question weaken the testimony's probative value.[5] Schaeffer may have lost possession of the firearm in the intervening time, and the years may have eroded the accuracy of Lashley's recollection. Nonetheless, any prejudice was minimal because there was very little in Lashley's testimony that cast Schaeffer in an unfair light. Unfair prejudice, under Rule 403, refers to the danger that the evidence in question "tends to suggest a decision on an improper basis." *Paschal v. Flagstar Bank*, 295 F.3d 565, 579 (6th Cir. 2002). Here, Lashley's testimony did not cast Schaeffer as having criminal or other negative tendencies; while shooting Schaeffer's firearm in Lashley's yard might have been illegal, neither the trial transcript nor the parties on appeal place any emphasis on this possibility. Target shooting is not in itself a morally dubious activity. At most, one could infer from Lashley's testimony that Schaeffer had a general propensity to possess firearms. But the district court instructed the jury not to draw inferences related to this propensity,[6] and the specificity of Lashley's testimony—the similarity between the gun Schaeffer showed Lashley and the object Schaeffer used in the robbery—likely drew the jury away from

---

[5] Lashley's testimony is vague about exactly when Schaeffer showed him the firearm, but it was clearly at least three years before the crimes in question and quite possibly more, as Lashley had lost touch with Schaeffer for about three years and got back in touch shortly after the August 11, 2012 robbery.

[6] Schaeffer does not challenge the adequacy of the instruction, only the admission of Lashley's testimony.

propensity-based inferences. Therefore, the prejudicial effect of Lashley's testimony did not outweigh its probative value, and it was properly admitted by the district court.

We need not decide whether the district court erred in excluding Ruffin's letter, because any error was harmless. A district court's evidentiary error is harmless unless "it was more probable than not that the error materially affected the verdict." *United States v. Trujillo*, 376 F.3d 593, 611 (6th Cir. 2004). Here, even assuming that Ruffin's letter was admissible as a statement against interest under Fed. R. Evid. 804(b)(3) or under the residual hearsay exception, Fed. R. Evid. 807, the evidence against Schaeffer on the count to which Ruffin's letter related was overwhelming and the letter offered only weak support to Schaeffer's case.

The evidence that Schaeffer had used a firearm on September 14, 2012 was voluminous and, taken together, highly persuasive. The firearm allegedly used on September 14, 2012, was recovered and admitted into evidence. Schaeffer committed two robberies that day (with Ruffin charged in only one of them), and the victims of both robberies, as well as Johnson, Schaeffer's co-conspirator and partner in both robberies, identified the firearm admitted into evidence as the firearm Schaeffer had used. The government also presented testimony from Johnson and one of Johnson's associates as to how Schaeffer had obtained and then disposed of the weapon. Lashley also testified that Schaeffer visited him on September 14, 2012, and had in his possession the gun that the government had recovered. Schaeffer testified that he used a fake gun, but he presented no corroborating evidence and admitted having limited memories of the events of September 14. Schaeffer's theory appears to have been that the gun recovered by the government was in fact Johnson's gun, which Johnson possessed but did not display during the September 14, 2012 robberies. But this still does not account for Lashley's testimony that he saw Schaeffer with the gun on September 14, or the robbery victims' identification of the gun as

the object Lashley was holding. While no single gun-identification would be conclusive, the unanimous agreement of witnesses that Schaeffer had possessed a particular firearm that all witnesses were able to identify is close-to-overwhelming evidence that Schaeffer did indeed possess that firearm.

Ruffin's letter would have ended this unanimity, of course, but it was such weak evidence that it is highly unlikely that it would have swayed the jury. Had Ruffin's letter been admitted, the government would undoubtedly have sought to impeach it. *See* Fed. R. Evid. 806. Ruffin's statement was unreliable for two reasons. First, the letter directly contradicted Ruffin's sworn affirmation of his plea agreement, which specifically stated that Schaeffer had used a gun in the September 14, 2012 robbery. Second, the government could have used Ruffin's recorded phone calls and the sentiments Ruffin expressed in the letter itself to suggest that Ruffin, as Schaeffer's friend, wrote the letter in an attempt to help Schaeffer avoid significant jail time. In the context of those recordings, the letter could easily be seen as the last gasp of Ruffin's attempt to coordinate testimony with Schaeffer. Even taken at face value, Ruffin's letter does not provide any supporting details or explain how he knew that a gun that he never possessed was fake. In light of the strength of the government's case against Schaeffer and the singular weakness of Ruffin's letter, it is not sufficiently likely that admitting Ruffin's letter would have materially affected the verdict.

For the foregoing reasons, we affirm Schaeffer's convictions.